IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| WESTCHESTER FIRE INSURANCE | ) | |
| COMPANY and THE NORTH RIVER | ) | |
| INSURANCE COMPANY, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 05-1523 |
| | ) | Judge Cercone |
| TREESDALE, INC. and PITTSBURGH | ) | Magistrate Judge Hay |
| METALS PURIFYING COMPANY, | ) | |
| Defendants. | ) | |


REPORT AND RECOMMENDATION

I.    Recommendation

It is respectfully recommended that the motion for summary judgment submitted on behalf of Plaintiffs (Docket No. 34) be denied.

II.    Report

Plaintiffs, Westchester Fire Insurance Company ("Westchester") and The North River Insurance Company ("North River"), bring this action against Defendants, Treesdale, Inc. ("Treesdale") and its subsidiary, Pittsburgh Metals Purifying Company ("Pittsburgh Metals"), seeking reformation of two insurance policies, one issued by Westchester and the other by North River, to include an asbestos exclusion.  In addition, Plaintiffs request a declaration that they have no duty to defend or indemnify Defendants with respect to certain asbestos-related bodily injury claims that have been asserted against them and Plaintiffs seek reimbursement for costs they have incurred in defending some of these claims to date.

Presently before this Court for disposition is a motion for summary judgment, brought by the Plaintiffs.  For the reasons that follow, the motion should be denied.

Facts

From approximately 1966 through 1975, Treesdale, through Pittsburgh Metals, used asbestos in the manufacture of "sideboards" and "rings" under the name "Soffelex." These products were used in steel mills to maximize temperature during both the steel-pouring process and in stripping steel ingots from their molds. (Shepard Aff. ¶ 7.)[1]

Treesdale and Pittsburgh Metals have been named as defendants, additional defendants, or third party defendants in lawsuits in Pennsylvania, Illinois, West Virginia, Ohio, Texas, Mississippi and Florida initiated by claimants who allege that they sustained bodily injury as a result of exposure to their products containing asbestos (the "Underlying Claims"). Many of the Underlying Claims have been asserted by steelworkers who were allegedly exposed to asbestos when they used the products in the course of their work in the steel mills. (Shepard Aff. ¶ 8.)

Until December 1, 2004, Liberty Mutual Insurance Company ("Liberty Mutual"), another insurer of Treesdale and/or Pittsburgh Metals, had been defending Treesdale and/or Pittsburgh Metals in connection with the Underlying Claims. On December 1, 2004, Liberty Mutual ceased its defense and indemnification of Treesdale and/or Pittsburgh Metals in the Underlying Claims. (Shepard Aff. ¶ 9.)[2]

---

[1]     Defs.' App. (Docket No. 39) Ex. B.

[2]     Liberty Mutual brought a declaratory judgment action in this Court against Treesdale and Pittsburgh Metals on December 18, 2002 (Civ. A. No. 02-2179), contending that it had no further duty to defend or indemnify once it had paid $5 million, the highest limit of liability under any of its umbrella excess liability policies. Upon cross-motions for summary judgment, the undersigned recommended that summary judgment be granted to Liberty Mutual because the asbestos claims arose from a single occurrence and policy limits could not be stacked. The court adopted the report and recommendation on September 27, 2004 and the defendants appealed. On August 15, 2005, the Court of Appeals affirmed in a published opinion. Liberty Mut. Ins. Co. v.

(continued...)

Through an investigation and review of Treesdale and Pittsburgh Metals' records, it was discovered that Westchester, North River, International Insurance Company ("International") and U.S. Fire Insurance Company ("U.S. Fire"), all of which are affiliated Crum & Forster companies, had issued several insurance policies to Treesdale and/or Pittsburgh Metals each year from August 1986 to July 1991. These policies included the following:

1) U.S. Fire Primary Policy No. 500-431383-9, for the period August 19, 1986 to August 19, 1987;
2) U.S. Fire Primary Policy No. 503-025506-1, for the period July 1, 1988 to July 1, 1989;
3) International Excess Umbrella Policy No. 523-496940-3, for the period July 1, 1988 to July 1, 1989 (Shepard Aff. Ex. B-1);
4) U.S. Fire Primary Policy No. 503-017843-5, for the period July 1, 1989 to July 1, 1990;
5) International Excess Umbrella Policy No. 523-541174-4, for the period July 1, 1989 to July 1, 1990 (Shepard Aff. Ex. B-2);
6) Westchester Primary Policy No. 503-506699-2, for the period July 1, 1990 to July 1, 1991; and
7) North River Excess Umbrella Policy No. 523-566963-9, for the period July 1, 1990 to July 1, 1991.

(Shepard Aff. ¶ 10.) The last two policies are the ones at issue in this case: 1) Westchester Primary (general liability) Policy No. 503-506699-2, in effect for the policy period July 1, 1990 to July 1, 1991, having limits of $1,000,000 per occurrence and in the aggregate for products/completed operations (the "Westchester Policy"); and 2) North River Excess Umbrella Policy No. 523-566963-9, in effect for the policy period July 1, 1990 to July 1, 1991, having limits of $1,000,000 per occurrence and in the aggregate for products/completed operations,

---

[2]      (...continued)
Treesdale, Inc., 418 F.3d 330 (3d Cir. 2005).

excess the Westchester Policy (the "North River Policy"). (Gallagher Aff. ¶¶ 3-4 & Ex. 1-B, Ex. 1-D;[3] Reiss Aff. ¶¶ 3-4 & Exs. 1, 2.[4])

On December 1, 2004, Treesdale requested that the carriers listed above provided defense and indemnification under the policies. (Shepard Aff. ¶ 11.) RiverStone Claims Management L.L.C. ("RiverStone"), as the claims administrator for both the Westchester and North River policies, received this request on December 2, 2004. This was the first time that notice was provided to Westchester and North River that the Underlying Claims had been filed or were pending. RiverStone later learned that the unspecified number of actions in "several jurisdictions" encompassed approximately 1,900 claims, and the letter further advised that a number of these cases were scheduled for trial and that they had no assets to retain counsel.

RiverStone responded by letter on December 7, 2004, in which it stated that it would provide a defense only under the Westchester Policy, as the other policies all contained absolute asbestos exclusions (and the Westchester Policy should have contained one but mistakenly did not) and that it was reserving its rights to deny coverage based on multiple policy exclusions and to seek reformation of the policy to include the omitted asbestos exclusion. (Gallagher Aff. ¶ 9 & Ex. 3; Reiss Aff. ¶ 9 & Ex. 7.) Treesdale contends that it learned for the first time in RiverStone's December 7, 2004 letter that the insurers were asserting that the Westchester and North River policies should have included an asbestos exclusion but mistakenly did not. (Shepard Aff. ¶ 12.)

---

[3]     Kristin Gallagher's affidavit is attached to Plaintiffs' Motion for Summary Judgment (Docket No. 34-4).

[4]     Docket No. 45.

On or about December 30, 2004, Westchester, pursuant to a reservation of rights, began defending, and to date continues to defend, Treesdale and/or Pittsburgh Metals in connection with certain Underlying Claims (the "Reservation of Rights Letter"). (Shepard Aff. ¶ 13.) Treesdale did not, at any time, advise the carriers that it would return, reimburse, or repay to the carriers any amount that they volunteered, agreed, and offered to pay for defense and indemnification of any asbestos claims. (Shepard Aff. ¶ 14.)

Westchester notes that, in the Reservation of Rights Letter, it reserved its right to seek reimbursement from Treesdale and/or Pittsburgh Metals for any and all sums that Westchester incurred in defending and/or indemnifying Treesdale and/or Pittsburgh Metals in connection with the Underlying Claims. (Gallagher Aff. ¶ 10 & Ex. 1-F; Reiss Aff. ¶ 10 & Ex. 8.)

By letters dated March 9, 2007, March 30, 2007, June 22, 2007, and June 29, 2007, Treesdale demanded defense and indemnification under the two International umbrella policies cited above. Treesdale has received no response to these demands. (Shepard Aff. ¶ 15 & Ex. B-3.)

Procedural History

Plaintiffs filed this action on November 1, 2005. Jurisdiction is based on diversity of citizenship because Westchester is a New York corporation with its principal place of business in Georgia; North River is a New Jersey corporation with its principal place of business in New Jersey; Treesdale is a Delaware corporation with its principal place of business in Saxonburg, Pennsylvania; Pittsburgh Metals is a division of Treesdale with its principal place of business in Saxonburg, Pennsylvania; and the amount in controversy exceeds the sum of $75,000, exclusive

of interest and costs. (Compl. ¶¶ 4-7, 9.)[5] 28 U.S.C. § 1332(a). Count I seeks reformation of the policies to include asbestos exclusions. Count II seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the policies do not cover the Underlying Claims, based either on the omitted asbestos exclusion or on the pollution exclusion. Count III seeks reimbursement or a claim of unjust enrichment based on Westchester's defense of Treesdale and/or Pittsburgh Metals from certain Underlying Claims.

On February 21, 2006, Defendants filed an answer and counterclaims under Pennsylvania law for bad faith in violation of 42 Pa. C.S. § 8371, unfair trade practices in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 to 201-9.3 (UTPCPL) and breach of contract/anticipatory breach of contract based on the carriers' denial of coverage (Docket No. 7).

On July 17, 2007, Plaintiff filed a motion for summary judgment. After the motion was briefed, Defendants filed a suggestion of bankruptcy on December 3, 2007 (Docket No. 51) and the case was administratively closed on December 7, 2007 (Docket No. 52). On February 14, 2008, Plaintiffs filed a motion to reopen the case (Docket No. 53), which was granted by order of Court on February 19, 2008 (Docket No. 54). Thus, the motion for summary judgment is now ripe for disposition.

---

[5]     In their answer, Defendants "deny" that subject matter jurisdiction exists and indicate that Treesdale was a Delaware corporation that has been dissolved and that Pittsburgh Metals was a Pennsylvania corporation that has been dissolved. (Answer ¶¶ 6-7, 9.) Nothing in this denial provides a basis for concluding that diversity of citizenship does not exist. Moreover, the capacity of a corporation to sue or be sued is determined under the laws of the state in which it is organized, Fed.R.Civ.P. 17(b), and Pennsylvania and Delaware law allow for dissolved corporations to be sued for periods of up to two and three years, respectively, 15 Pa. C.S. § 1979(a)(2); 8 Del. C. § 278. Defendants have not sought dismissal of this case on the grounds that it was initiated against them too late under state law.

Standard of Review for Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

Plaintiffs argue that: 1) the Westchester and North River policies should be reformed to include an asbestos exclusion precluding coverage for the Underlying Claims; 2) the pollution exclusion in the policies would preclude coverage for the Underlying Claims in any event; 3) Treesdale and/or Pittsburgh Metals provided late notice of the Underlying Claims, which also precludes coverage; and 4) Westchester is entitled to reimbursement from Defendants for defending certain Underlying Claims when it was not obligated to do so.

Defendants respond that: 1) the insurers have not met their burden of producing clear, precise and indubitable evidence of mutual mistake, especially because previous umbrella

policies did not include asbestos exclusions, nor have they demonstrated that Treesdale had knowledge of their unilateral mistake, and they cannot demonstrate the parties' intent based on previous policies from other insurers, confirmations of insurance, prices paid or the Dorazio affidavit, and thus their request for reformation of the policies should be denied; 2) the pollution exclusion in the policies does not bar coverage for the asbestos claims because asbestos is not a "pollutant" and because the claims did not arise out of the dispersal of asbestos in any of the four circumstances described therein; 3) Treesdale notified the carriers immediately after Liberty Mutual ceased defending and indemnifying them with respect to the Underlying Claims in December 2004 and in any event the carriers have not demonstrated that they were actually prejudiced by what they contend was late notice; and 4) the carriers are not entitled to reimbursement of any amount paid for the defense of any Underlying Claims because the policies contain no provisions entitling them to recover these costs and without explicit provisions such recovery is not permitted under Pennsylvania law as predicted by the Court of Appeals.[6]

Reformation of Insurance Contracts

Plaintiffs argue that the asbestos exclusion was erroneously omitted from the policies and seek reformation of the policies to include this exclusion. Defendants respond that Plaintiffs have not met their burden for establishing reformation.

---

[6]     Defendants' first argument in their brief was that the insurers' documents were not properly authenticated and were not properly part of the record because litigation counsel Kristin Gallagher did not establish that she had personal knowledge of the insurers' operations, history, documents or business. (Docket No. 40 at 4-5.) Plaintiffs responded by arguing that Gallagher's affidavit was sufficient and by submitting the affidavit of Agnes Reiss, litigation manager with U.S. Fire, who asserts that she was assigned to the administration of the claims at issue in this case and has personal knowledge of the facts set forth therein (Reiss Aff. ¶¶ 1- 2). Defendants have not pursued the lack of authentication argument in their sur-reply brief.

The parties agree that Pennsylvania law applies in this case. <u>See</u> Pls.' Br. (Docket No. 35) at 7-9); Defs.' Br. (Docket No. 40) at 6 n.1. Under Pennsylvania law, reformation "is an equitable remedy that is sparingly granted." <u>Twin City Fire Ins. Co. v. Pittsburgh Corning Corp.</u>, 813 F. Supp. 1147, 1149 (W.D. Pa. 1992), <u>aff'd mem.</u>, 6 F.3d 780 (3d Cir. 1993). "A party seeking reformation of a contract, which includes an insurance policy, has the burden to prove by clear, precise and convincing evidence that, as a result of a mistake, a written instrument does not truly express the intention of the parties." <u>Id.</u> (citation omitted). The Pennsylvania Superior Court has stated that:

> The term "clear and convincing evidence" means that the witnesses must be found to be credible, that the facts to which they have testified are remembered distinctly and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable either a judge or jury to come to a clear conviction, without hesitation, of the truth of the precise facts in issue.

<u>Jones v. Prudential Property & Casualty Ins. Co.</u>, 856 A.2d 838, 844 (Pa. Super. 2004) (citation omitted), <u>appeal denied</u>, 876 A.2d 396 (Pa. 2005). In that case, Kim Jones contended that an automobile policy that designated her husband as "first named insured" was in error because she had told Prudential that she was to be the first named insured, but her testimony at trial was that she was unable to recall the substance of the conversation with Prudential's agent or even his name. Thus, the court concluded that she did not meet her burden of proving by clear and convincing evidence that the policy should be reformed because of a mutual mistake.

Plaintiffs cite the <u>Twin City</u> case as being directly on point. In that case, after a non-jury trial, Judge Mencer determined that: 1) the insurer had issued two excess umbrella policies to Pittsburgh Corning covering 1983-1984 and 1984-1985; 2) as a result of increasing awareness of the liability exposure of Pittsburgh Corning for claims allegedly arising from its asbestos-

containing thermal insulation products beginning no later than July 1, 1980, all primary comprehensive general liability insurers had issued policies to Pittsburgh Corning that contained asbestos exclusions; 3) the immediately preceding policy (for 1982-1983) had contained an asbestos exclusion and was issued for the identical annual premium as the Twin City policy; 4) the two policies at issue contained a personal injury asbestos exclusion but not a property damage asbestos exclusion; and 5) all the evidence (particularly letters between the parties) indicated that the parties intended to create a policy identical to the one that existed for the prior year.  The court concluded as follows:

> It seems clear to this Court that it was the understanding of both parties to this litigation that the policy for the year 1983 coverage would include the same asbestos exclusions which were contained in the Old Republic policy which provided the 1982 coverage.  The $8,600 premium for each of these two years further indicates that there was no intent to change the exclusions as to asbestos coverage.  Certainly, if Pittsburgh Corning desired broader coverage with less exclusion as to asbestos claims, and if Twin City had been willing to provide such expanded coverage, an increase in premium would have been the factor that would best evidence such an intent.

> There is no dispute among the parties that the conditions of the 1982 Old Republic policy did exclude all claims arising from asbestos or asbestos products and that Mr. Trumbower [who issued the policy] was aware that the same was true as to all of Pittsburgh Corning's primary policy coverages.

> Accordingly, the incorrect exclusion contained in the 1983 policy, which did not exclude property damage claims related to asbestos or asbestos products, was a mutual mistake and a legal basis for reformation of the insurance policy.

813 F. Supp. at 1150.  Therefore, the court ordered the policies reformed to include the complete asbestos exclusion.

Plaintiffs also cite General Electric Credit Corp. v. Aetna Casualty & Surety Co., 263 A.2d 448 (Pa. 1970).  In that case, GECC brought suit to recover on seven fire insurance policies, each issued by a different company but through the same agent, for damage to equipment in a

restaurant that was damaged in a fire. At trial, testimony of the attorney who handled the closing

(Stanley Makoroff) revealed that, although GECC specifically requested that it wanted a special

lender's loss payee clause attached to the policy such that its equipment would be covered

regardless of any act of negligence by the primary insured (Silver Spur), two of the seven policies

erroneously did not contain this clause, but instead listed GECC as a mortgagee. The fire was the

result of arson by the owners of Silver Spur and therefore the mortgagee clause did not allow

GECC to recover. GECC sought reformation of the two policies to include the special lender's

loss payee clause.

The Pennsylvania Supreme Court stated that:

> if the facts were believed as alleged by GECC, GECC would have been entitled to
> a reformation of the policies... Parol evidence is generally admissible for the
> purpose of showing that, by reason of a mutual mistake, a written instrument does
> not truly express the intention of the parties. But to obtain the reformation of a
> contract because of mutual mistake, the moving party is required to show the
> existence of the mutual mistake by evidence that is clear, precise and convincing.
> This requires evidence by two witnesses or by one witness and corroborating
> circumstances

> In this case, there was testimony of only one witness, Attorney Makoroff,
> as to the circumstances in which the insurance was ordered. His testimony was
> therefore uncontradicted. Although he was an interested witness, being an
> attorney for one of the parties, his testimony was 'clear, precise and convincing'.
> Attorney Makoroff's credibility is enhanced by the very substantial corroborating
> circumstances in this case. The Lender's Loss Payable Clause allegedly requested
> by GECC was in fact included in five of the seven insurance policies issued to
> GECC. The clause so inserted in all five policies was a standard form clause,
> Form No. 544-Edition Date 6/54. No reasonable justification is raised in defense
> why GECC would ever have wanted different coverages in the seven policies, and
> the designation of GECC as mortgagee only in some policies, as lender's loss
> payee in one and as both in others supports Attorney Makoroff's testimony
> concerning Mr. Mattey's belief, or at least uncertainty, over the proper clause to
> adequately protect GECC. Attorney Makoroff's intent seemed clear, however.
> This evidence, therefore, met the standard of being clear, precise and convincing
> so as to support a reformation of the insurance contract for mutual mistake, if the
> jury believed the testimony of Attorney Makoroff.

Id. at 456-57 (footnote and citations omitted). Attorney Makoroff admitted that he failed to review the policies and the court noted that such review would have revealed the insurers' mistake in failing to include the special lender's loss payee clause. However, the court held that "if all of the elements necessary for the reformation of a written contract are present, mere negligent conduct on the part of one of the parties thereto in failing to discover the mistake will not bar reformation in the absence of prejudice or a violation of a positive legal duty." Id. at 457 (citations omitted). Because there was no evidence of record of prejudice to the insurers from the mutual mistake and because GECC did not violate any positive legal duty, the court held that the trial court should have charged the jury accordingly and that its failure to do so constituted reversible error entitling GECC to a new trial.

Defendants argue that Twin City, Jones and GECC all went to trial and therefore the evidence was weighed, in light of the very high burden of proof. They also note that in Twin City, the insured became aware of the mistake in 1983 and therefore the existence of a mutual mistake was demonstrated. The insurer was entitled to reformation because the evidence clearly established that the insured was aware that a renewal policy had a different asbestos exclusion than the previous year's policy and actively failed to disclose this mistake to the insurer in bad faith.

Plaintiffs contend that they have demonstrated that reformation is required in this case based on the following five factors: 1) the U.S. Fire Policy which immediately preceded the Westchester Policy contained an asbestos exclusion and there was no significant increase in premiums for the 1990-91 policy to justify removal of the asbestos exclusion (in fact the cost went down); 2) Treesdale's application for insurance indicated that it used to employ asbestos in

its manufacturing and a note was made on the application to add an asbestos exclusion; 3)

confirmations of insurance indicated that asbestos exclusions would be included in both policies;

and 4) underwriter Victor Dorazio states that the exclusion must have been inadvertently

omitted.[7]

Evidence of Previous Policies and Premiums

The policy issued by U.S. Fire to Treesdale that immediately precedes the Westchester

Policy, Policy No. 503-017843-5, in effect for the policy period of July 1, 1989 to July 1, 1990

(the "U.S. Fire Policy"), under which Pittsburgh Metals is an additional insured, contained an

asbestos exclusion, which provided as follows:

ASBESTOS EXCLUSION - ASBESTOS LIABILITY

This endorsement modifies insurance provided under the following:

Commercial General Liability Coverage Part

The following additional exclusion applies to Coverage A and B of the
Commercial General Liability Coverage Part:

This Insurance does not apply to "bodily injury," "personal injury," or "property
damage" caused by, resulting from or arising out of:

     1. asbestos, asbestos fibers or asbestos products or to any
     obligation of the insured to indemnify another and/or contribute
     with another because of damage arising out of, or as a result of
     such "bodily injury", "personal injury", or "property damage";

     2. any supervision, instructions, recommendations, notices,
     warnings or advice given or which should have been given in
     connection with the manufacturing, selling, and/or distributing of

---

[7]     Plaintiffs contend that courts generally consider three types of evidence in determining whether to reform a policy.  (Docket No. 35 at 5-6.)  As Defendants note, however, none of the cases cited by Plaintiffs sets forth any such requirement.

asbestos, asbestos fibers or asbestos products or products
containing asbestos;

3. removal of asbestos or products containing asbestos including:

a. cost of asbestos removal and replacement with other fire
retardant materials;
b. property damage in the course of removing asbestos,
asbestos fibers or asbestos products.

In addition, we shall not be obligated to investigate, to pay any claim or
judgement or to defend any "suit" for "bodily injury", "personal injury", or
"property damage" caused by, resulting from or arising out of asbestos, asbestos
fibers or asbestos products.

(Gallagher Aff. ¶ 5 & Ex. 1-A at endorsement entitled "Asbestos Exclusion - Asbestos

Liability.")  The "Total Advance Premium" for the U.S. Fire Policy was $34,604.00.  (Gallagher

Aff. Ex. 1-A; Reiss Aff. ¶ 5 & Ex. 3.)   The "Total Advance Premium" for the Westchester

Policy was $22,804.00.  (Gallagher Aff. Ex. 1-B.)

Defendants respond that the prior umbrella policies did not contain asbestos exclusions.

Specifically, they note that: 1) International Policy No. 523-46940-3, for the period July 1, 1988

to July 1, 1989; and 2) International Policy No. 523-541174-4, for the period July 1, 1989 to July

1, 1990 provided coverage for asbestos-bodily injury claims and related defense costs under

Coverage B, which is broader umbrella liability insurance that does follow the form of any

underlying insurance policy, does not incorporate any outside policy language by reference and

does not include an asbestos exclusion.  Rather, Coverage B is defined as follows:

With respect to any loss covered under the terms and conditions of the policy, but
not covered as warranted by the underlying policies listed on schedule A [the U.S.
Fire CGL Policies], or any other underlying insurance, we will pay on your behalf
for loss caused by an "occurrence" which is in excess of the "retained limit" for
liability imposed on you by law or assumed by you under contract for Bodily
Injury....

(Shepard Aff. Exs. B-1 and B-2 at Defender Form "Insuring Agreements," § I, B.)

Defendants point to <u>Westview Associates v. Guaranty National Insurance Co.</u>, 740 N.E.2d 220 (N.Y. 2000), as a case directly on point. In <u>Westview Associates</u>, an insured apartment building owner sought a declaratory judgment that the insurer had a duty under an umbrella policy to defend and indemnify it against a tenant's action alleging personal injury from ingestion of lead paint. The insurer refused to defend or indemnify based on a specific exclusion for lead paint in the underlying policy. The insured argued that, although the underlying policy contained this exclusion and although Coverage A of the umbrella policy incorporated it, the umbrella policy also contained Coverage B, which did not contain an incorporation clause and which provided additional primary coverage for certain claims not already covered by the underlying policy. New York's highest court agreed, concluding that Coverage B did not incorporate the exclusions of the underlying policy and in addition, the umbrella policy contained other exclusions that would have been completely unnecessary if the insurer was correct that all of the exclusions of the underlying policy were incorporated by reference into the entirety of the umbrella policy's coverage.

Thus, Defendants contend that not all of the prior policies would have excluded coverage for asbestos-related bodily injury claims. They also contend that the North River Policy, which Plaintiffs contend should be reformed to resemble the prior umbrella policies, would not have an asbestos exclusion even if the Westchester Policy were reformed to include one. In addition, they argue that no conclusions can be drawn based on the premiums paid for the U.S. Fire and Westchester policies, which were issued by different insurers for different circumstances:

> Certainly, the Carriers cannot dispute that a myriad of factors influence liability
> insurance premiums, including, but not limited to, claims history, sales, products

sold, services provided, amount and substance of underlying coverage, coverage available in other policy years, and number of employees. Absent a comparison of the aforementioned factors, no informed or relevant comparison of the premiums can be made. Indeed, without further explanation and analysis from a qualified source (which does not include the conclusory statements of counsel for the moving party in an affidavit), such raw numbers are devoid of any meaning.

(Docket No. 40 at 14-15.)

Application Information

The application for the policies at issue specifically asked whether Treesdale "ever sold, manufactured, handled or distributed any products containing asbestos." Treesdale answered the question as follows: "Up until 1975, Insd. Mfg. Hot Top Products using Asbestos, All stock sold by 1976." Thus, a notation was made to "add asbestos excl." (Gallagher Aff. ¶ 6 & Ex. 2; Reiss Aff. ¶ 6 & Ex. 4.)

Confirmations of Insurance

The Westchester Policy was negotiated by The Marsh & McLennan Companies ("Marsh & McLennan"), who acted as the insurance agent for Treesdale and Pittsburgh Metals with regard to the issuance of the Westchester Policy. (Gallagher Aff. Ex. 1-C.) On or about June 29, 1990, prior to the issuance of the Westchester Policy, Marsh & McLennan sent a confirmation of insurance on behalf of Treesdale and/or Pittsburgh Metals to Westchester/U.S. Fire concerning the Westchester Policy, a copy of which was provided to Treesdale and/or Pittsburgh Metals. (Gallagher Aff. ¶ 7 & Ex. 1-C; Reiss Aff. ¶ 7 & Ex. 5.)

Under "Description of Insurance," the confirmation of the Westchester Policy lists the type of insurance to be provided by Westchester Policy:

DESCRIPTION OF COVERAGE:

This policy will provide protection against legal liability claims for Bodily Injury or Property Damage arising out of the premises, operations, contingent liabilities arising from construction, certain liabilities assumed under contract, your products, and elevators including all of the following:

* * *

SPECIAL EXCLUSION:

An absolute Pollution exclusion for gradual or sudden and accidental pollution and the asbestos exclusion are part of this policy.

(Gallagher Aff. Ex. 1-C; Reiss Aff. Ex. 5.)

Marsh & McLennan also negotiated the North River Policy on behalf of Treesdale and Pittsburgh Metals acting as the insurance agent for Treesdale and Pittsburgh Metals with regard to the issuance of the North River Policy. (Gallagher Aff. Ex. 1-D.) On or about June 29, 1990, prior to the issuance of the North River Policy, Marsh & McLennan sent a confirmation of insurance to North River/U.S. Fire concerning the North River Policy, a copy of which was provided to Treesdale and/or Pittsburgh Metals. (Gallagher Aff. ¶ 8 & Ex. 1-E; Reiss Aff. ¶ 8 & Ex. 6.)

Under "Description of Insurance," the confirmation of the North River Policy lists the type of insurance to be provided by North River Policy:

DESCRIPTION OF COVERAGE:

This policy provides coverage in excess of the underlying insurance limits subject to the specific policy form exclusions.

SPECIAL EXCLUSIONS:

•       Excludes all claims arising out of Asbestos

(Gallagher Aff. Ex. 1-E.)

Defendants argue that a confirmation of insurance is not a substitute for the terms of a policy; that even if the confirmations constituted binders, a binder is only in effect until the actual policy is issued; that extrinsic evidence cannot be used to modify agreements that are unambiguous (and the policies at issue unambiguously did not contain an asbestos exclusion); and that the confirmations do not demonstrate that Treesdale had "such knowledge of the mistake as justify an inference of fraud or bad faith." Strickler v. Huffine, 618 A.2d 430, 433 (Pa. Super. 1992).

Dorazio Affidavit

Victor Dorazio, who was employed by Crum & Forster and/or one of its predecessors from September 1986 through December 1994 and who acted in a supervising capacity in the underwriting department from 1990-1991 (Dorazio Aff. ¶ 1),[8] states that he reviewed the Westchester Policy and the U.S. Fire Policy and makes the following conclusions:

> The 1990-91 Westchester Policy was a renewal of the 1989-90 U.S. Fire Policy.

> Based on my review of the available underwriting material, the U.S. Fire Policy contained an asbestos exclusion form number FM 101.0.1059 (5-88).

> Based on my review of the available underwriting material, asbestos exclusion form number FM 101.0.1059 (5-88) was not included in the 1990-91 Westchester Policy.

> It is my recollection that at the time of the issuance of the Westchester Policy in the 1980s and early 1990s, commercial general liability policies usually contained asbestos exclusions similar to the one in the U.S. Fire Policy.

> Based on my review of the available underwriting materials provided to me for both the 1989-90 U.S. Fire Policy and the 1990-91 Westchester Policy, there is no indication of an overt decision to remove the asbestos exclusion.

---

[8] Gallagher Aff. Ex. 4.

Accordingly it is my belief that an asbestos exclusion was mistakenly omitted from the Westchester Policy.

(Dorazio Aff. ¶¶ 4-9.)

Defendants note that Dorazio does not state that he worked on the Treesdale files, that he states that he merely reviewed files but not that he had any involvement with issuing the policies, and that he merely states his "belief" that the asbestos exclusion was mistakenly omitted. Thus, they contend that this evidence does not meet the standard of being clear, precise and indubitable.

Plaintiffs have submitted circumstantial evidence that could support a finding that an asbestos exclusion was intended by the parties to be included in the Westchester Policy but was omitted by mutual mistake. However, they have not demonstrated as a matter of law that they are entitled to reformation of the policy to include this exclusion. As Defendants note, all of the cases cited by the insurers concluded that reformation was called for after a trial at which the trier of fact weighed the evidence and rendered a decision. Plaintiffs have not proffered testimony from an individual representing Treesdale to the effect that he was aware of a history of policies containing asbestos exclusions, as the court considered in the <u>Twin City</u> case. Moreover, Defendants have submitted testimony that they were unaware until Treesdale submitted a claim for coverage in 2004 that the insurers were taking the position that the policies mistakenly failed to contain an asbestos exclusion. The trier of fact may choose not to believe Mr. Shepard's statements, but the Court cannot do so as a matter of law in deciding a motion for summary judgment.

In addition, some of the evidence upon which Plaintiffs rely requires the drawing of inferences. For example, the fact that the U.S. Fire Policy that immediately preceded the Westchester Policy contained an asbestos exclusion and had a higher premium than the

Westchester Policy requires drawing an inference that the policies were issued under similar or identical circumstances, but Plaintiffs have presented no evidence or testimony to compare the circumstances. In resolving motions for summary judgment, all evidence must be viewed in the light most favorable to and all inferences must be drawn in favor of the non-moving party, in this case the Defendants.

Plaintiffs also argue that all of the previous policies contained an asbestos exclusion, but Defendants have pointed out that the two International umbrella policies did not contain this exclusion and they have cited authority that would support a conclusion that Coverage B may be available under the umbrella policies. Thus, the circumstantial evidence is not as conclusive as Plaintiffs contend.

The trier of fact will have to consider and weigh the evidence and testimony that Plaintiffs proffer, as well as the evidence and testimony proffered by Defendants. The argument for reformation of the Westchester Policy to include an asbestos exclusion is not availing.

<u>Unilateral Mistake</u>

Plaintiffs cite the quote from the <u>GECC</u> case about negligent conduct not barring reformation, but it is not applicable to this situation. The issue in this case is not whether "negligent conduct" occurred, that is, whether the insured failed to catch an alleged mistake in the policy. Rather, this case presents the scenario of a mistake by the insurance company, drafter of the policy. As the Pennsylvania Superior Court has stated: "If a mistake is not mutual but unilateral and is not due to the fault of the party not mistaken, but to the negligence of the one who acted under the mistake, it affords no basis for relief in rescinding the contract...." <u>Smith v.</u>

Thomas Jefferson Univ. Hosp., 621 A.2d 1030, 1032 (Pa. Super.) (citation omitted), appeal denied, 631 A.2d 1009 (Pa. 1993).

Pennsylvania courts hold that, "in the case of unilateral mistake, the party against whom reformation is sought must be shown to have knowledge of the mistake sufficient to justify an inference of fraud or bad faith." Regions Mortgage, Inc. v. Muthler, 889 A.2d 39, 42 (Pa. 2005). See also Line Lexington Lumber & Millwork Co. v. Pennsylvania Publishing Co., 301 A.2d 684, 687-88 (Pa. 1973) (owner and lessor of building destroyed by fire submitted sufficient evidence that it notified insurer of appropriate facts and insurer erroneously named lessee as insured in policy and therefore insurer was estopped from preventing reformation of policy to reflect actual intentions of insured).

In this case, Treesdale argues that there is no evidence that it was even aware of any discrepancy between the confirmation of insurance and the policy, much less that it actively concealed this discrepancy from the insurers or disclosed knowledge of it to a third party. Treesdale contends that it learned for the first time in RiverStone's December 7, 2004 letter that the insurers were asserting that the Westchester and North River policies should have included an asbestos exclusion but mistakenly did not. (Shepard Aff. ¶ 12.) Plaintiffs have not demonstrated that Treesdale had knowledge of the alleged mistake sufficient to justify an inference of fraud or bad faith.

Pollution Exclusion

When interpreting the application of an exclusion contained in an insurance policy, the court must first determine whether the exclusion is ambiguous. If the exclusion is clear, it will be given its plain meaning. If it is ambiguous, it will be construed in favor of the insured.

<u>Madison Constr. Co. v. Harleysville Mut. Ins. Co.</u>, 735 A.2d 100, 106 (Pa. 1999). Plaintiffs

contend that the pollution exclusion precludes coverage for asbestos claims. Defendants respond

that asbestos does not fall within this exclusion.

The Westchester Policy contains a pollution exclusion, which, in relevant part, provides:

This insurance does not apply to: . . .

f. (1) "Bodily Injury" or "Property Damage" arising out of the actual, alleged, or threatened discharge, dispersal, release, or escape of pollutants:

(a) At or from premises you own, rent or occupy;

(b) At or from any site or location used by or for you or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for you or any person or organization for whom you may be legally responsible; or

(d) At or from any site or location on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations:

(I) if the pollutants are brought on or to the site or location in connection with such operations; or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants....

Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned, or reclaimed.

(Gallagher Aff. Ex. 1-B.) The Westchester Policy defines "bodily injury" as "bodily injury,

sickness or disease sustained by a person, including death from any of these at any time."

(Gallagher Aff. Ex. 1-B at § v(3).)

The North River Policy also contains a pollution exclusion, which, in relevant part, provides:

This policy does not apply to: ...

J. (1) "Bodily Injury" or "Property Damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants (as defined below):

(a) that are, or that are contained, in any property that is:

(I) being moved from the place where such property or pollutants are accepted by the "insured" for movement into or onto an "Automobile";

(ii) being transported or towed by the "Automobile";

(iii) otherwise in the course of transit by the "insured";

(iv) being stored, disposed of, treated or processed in or upon the "Automobile"; or

(v) being moved from the "Automobile" to the place where such property or pollutants are finally delivered, disposed of or abandoned by the "insured";

(b) at or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any "insured";

(c) at or from any premises, site or location which is or was at any time used by or for any "insured" or others for the handling, storage, disposal, processing or treatment of waste (as defined below);

(d) which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any "insured" or any person or organization for whom any "insured" may be legally responsible; or

(e) at or from any premises, site or location on which any "insured" or any contractors or subcontractors working directly or indirectly on any "insured's" behalf are performing operations:

> (I) if the pollutants are brought on or to the premises, site or location in connection with such operations by such "insured", contractor or subcontractor; or
>
> (ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants....

> For purposes of this Exclusion J, the term "pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including without limitation smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste and the term "waste" includes materials to be recycled, reconditioned or reclaimed.

(Gallagher Aff. Ex. 1-D; Reiss Aff. ¶ 4 & Ex. 2.)  The North River Policy defines "bodily injury" as "bodily injury, sickness, disease, disability, shock, mental anguish, mental injury and humiliation, including death."  (Gallagher Aff. Ex. 1-D at § IV(C).)

Defendants note that asbestos is not listed under the definition of pollutants in either policy.  They argue that, as other courts have concluded, asbestos does not constitute a pollutant under such an exclusion.  In Owens-Corning Fiberglas Corp. v. Allstate Ins. Co., 660 N.E.2d 746 (C.P. Ohio 1993), the court was presented with this very issue.  It held as follows:

> the term "asbestos" is not clearly listed in the exclusion.  It, furthermore, is far from certain whether asbestos constitutes an "irritant," "contaminant," or "pollutant" within the meaning of the exclusion.  Moreover, it is anything but certain that asbestos released from building materials inside or surrounding buildings constitutes an emission into the "atmosphere" within the context of the exclusion.  Accordingly, the court finds the clause ambiguous, at least with regard to these issues.  Construction of the exclusion is thus required, keeping in mind, of course, that such construction must be strictly against [the insurers].

Id. at 749.  Having found the phrase ambiguous, the court proceeded to construe it, addressing five issues.  It concluded that: 1) historically, the pollution exclusion had been developed in response to insurers' concerns over environmentally related losses and liabilities; 2) no authority supported the insurers' contention that asbestos was an irritant, contaminant or pollutant; 3) the

manner in which asbestos was released had no bearing on the application of the standard pollution exclusion; 4) asbestos fibers inhaled inside a building were not released "into the atmosphere" as stated in the pollution exclusion; and 5) since express asbestos exclusion clauses had existed for years, the insurers could have clearly excluded asbestos coverage by inserting such a clause. Therefore, the court held that asbestos did not meet the definition of a pollutant under the pollution exclusion and denied the insurers' motion for summary judgment.

In <u>Madison Construction</u>, a worker was injured when he was overcome by fumes from an indoor floor sealant. The insurer denied coverage, contending that the pollution exclusion applied. The Pennsylvania Supreme Court held that: 1) the floor sealant was a pollutant because reports of its contents documented their harmful effects; and 2) there was a discharge, dispersal, release or escape of the fumes because these terms were meant to comprehend all such types and degrees of movement. 735 A.2d at 107-08. However, in <u>Litiz Mutual Insurance Co. v. Steely</u>, 785 A.2d 975 (Pa. 2001), the same court held that an insurer owed coverage to claims arising out of a child who had been injured by ingesting lead paint because the paint was not discharged or released into the atmosphere, but instead deteriorated over time and through this process of surface degradation, small fragments, chips and microscopic particles of paint became available for inhalation or ingestion. Although the policies contained identical pollution exclusions, the manner in which lead-based paint "moved" was significantly different from the manner in which the fumes from the sealant moved in <u>Madison</u>. <u>See also</u> <u>Meridian Mut. Ins. Co. v. Kellman</u>, 197 F.3d 1178 (6th Cir. 1999) (fumes from floor sealant injured teacher at school one floor below room where it was being applied; parties agreed that it was pollutant and question was whether movement of vapors was a "discharge, dispersal, seepage, migration, release or escape" so as to

fall within total pollution exclusion; Sixth Circuit noted that courts were split, with some finding that this exclusion applies only to injuries caused by traditional environmental pollution and others holding that it excluded all injuries caused by the release of contaminants even where the contaminant is dispersed into a confined or indoor area; no Michigan state court had addressed the issue; court held that, given disarray in the law in 1994–when accident occurred–and 1999 no reasonable person could find that the policy unambiguously excluded coverage in the situation presented, lack of "into or upon land, the atmosphere, or any watercourse or body of water" did not distinguish the case, fact that teacher was not the direct user of the product did not change the situation).

In the <u>Westview</u> case, the court held that the pollution exclusion did not exclude coverage for lead paint poisoning because the definition of pollutants included "smoke, vapors, soot, fumes, acids, sounds, alkalies, chemicals, liquids, solids, gases, thermal 'pollutants,' and all other irritants and 'contaminants.'" Thus, the definition did not contain "clear and unmistakable" language that lead paint was included. In addition, both policies contained the general pollution exclusion while only the underlying policy contained a specific lead paint exclusion and thus, unless the clauses had different meanings, the specific lead paint exclusion in the underlying policy would be rendered meaningless. 740 N.E.2d at 223.

As these cases demonstrate, the state of the law on the question of whether asbestos is a pollutant is unresolved. However, the Court need not resolve that difficult issue in this case because, as Defendants note, both policies require that the pollutant be dispersed in one of several defined ways to fall within the exclusion. Plaintiffs have not argued, much less demonstrated, that the manner in which the asbestos "moved" in the Underlying Claims meets

any of these defined ways.[9]  On the contrary, Defendants have asserted that the majority of claims

against Treesdale were submitted by steelworkers who were allegedly exposed to its products in

the course of their work in the steel mills, namely after the products left Treesdale's control.

Thus, the circumstances behind the Underlying Claims do not suggest that asbestos was

dispersed, discharged, released or allowed to escape: 1) at Treesdale's premises; 2) at a site used

by Treesdale to dispose of waste; 3) out of pollutants which were transported, handled, treated,

disposed of, or processed as waste by Treesdale; or 4) or at any site or location at which

Treesdale or its contractors were performing operations.

In addition, as noted by the court in the Westview case, previous policies contained both

an asbestos exclusion and a pollution exclusion.  If asbestos falls within the definition of

pollutant, the more specific asbestos exclusion in these policies would be rendered meaningless.

Therefore, Plaintiffs have not demonstrated that the pollution exclusions in the policies clearly

apply to this situation.

Late Notice

Plaintiffs contend that the notice they were provided was late.  Defendants respond that

they provided notice as soon as they learned that Liberty Mutual would no longer defend and

indemnify them and that the insurers have failed to demonstrate that they suffered prejudice as a

result of the alleged late notice.

The Westchester Policy states that:

Duties In The Event of Occurrence, Claim Or Suit

_____

[9]     Indeed, Plaintiffs have not even described the details of the Underlying Claims
sufficiently for any determination to be made about the manner in which the asbestos caused
harm.

a.    You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim.

* * *

b.    If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

c.    You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit"

(Gallagher Aff. Ex. 1-B at § IV(2).)

Similarly, the North River Policy states that:

E. Duties in the Event of "Occurrence", "Claim" or "Suit".

(1) You must notify us of any "Occurrence" which may result in a "Claim" or "Suit under this policy.

(2) If a "Claim" is made or a "Suit" is brought against any "Insured" that is likely to involve this policy, you must notify us, in writing, of the "Claim" or "Suit" as soon as possible.

(3) You and any other involved "insureds" must:

(a) immediately send us copies of any demands, notices, summonses or legal papers received in connection with any "Claim" or "Suit"

(Gallagher Aff. Ex. 1-D at Conditions § E.)

The Pennsylvania Supreme Court "considers prejudice to the insurance company as a material factor in determining whether to relieve the insurance company of its coverage obligations by virtue of late notifications." Brakeman v. Potomac Ins. Co., 371 A.2d 193, 195

28

(Pa. 1977). Moreover, the court "requires the insurance company to prove not only that the notice provision was breached, but also that it suffered prejudice as a consequence." Id. at 196. See also Trustees of Univ. of Pa. v. Lexington Ins. Co., 815 F.2d 890, 899 (3d Cir. 1987) ("prejudice requires a showing that the lateness of notice probably altered the result.")

In this case, the insurers merely assert that they have been prejudiced because by the time they received notice of an "unspecified number" of claims, their ability to investigate or defend was hampered by the fact that several of the Underlying Claims had proceeded and were ready for trial and at least one had already resulted in a verdict. As Defendants observe, however, these cases were being defended by Liberty Mutual until December 1, 2004. Plaintiffs' position requires drawing an inference that they were actually prejudiced because they were not notified at an earlier date. As noted above, however, all inferences must be drawn in favor of Defendants as the non-moving party on this motion. "The mere interference with [the insurer's] right to 'associate' in the defense of the claim is too amorphous and cannot itself constitute prejudice unless [the insurer] can demonstrate that earlier notice would have probably led to a more advantageous result." Trustees of Univ. of Pa., 815 F.2d at 899. Plaintiffs have not argued that late notice altered the result of the verdict or that they suffered damages proximately related to the alleged late notice.

Because Plaintiffs have not demonstrated that the policies should be reformed to contain an asbestos exclusion, that the pollution exclusion clearly applies or that they were prejudiced because they received late notice, they have not established that they had no duty to defend the Underlying Claims. Therefore, the Court need not address the argument that they are entitled to be reimbursed for amounts already spent in defending these claims.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Plaintiffs (Docket No. 34) be denied.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are permitted to file written objections and responses thereto in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation.  Failure to timely file objections may constitute waiver of any appellate rights.

Respectfully submitted,

*/s/  Amy Reynolds Hay*
United States Magistrate Judge

Dated:  26 March, 2008

cc:      Hon. David Stewart Cercone
         United States District Judge

         All counsel of record by Notice of Electronic Filing